**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ANTOINETTE PORTILLO, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiff,<br><br>vs.<br><br>NEBULA GENOMICS, INC., a Delaware Corporation, META PLATFORMS, INC., a Delaware Corporation, MICROSOFT CORPORATION, a Washington Corporation, and GOOGLE LLC, a Delaware Limited Liability Company,<br><br>Defendants. | Case No. 1:24-cv-09894-JIC<br><br>Hon. Jeffrey I. Cummings |

**PLAINTIFF'S RESPONSE TO DEFENDANT NEBULA GENOMICS, INC.'S MOTION TO TRANSFER OR IN THE ALTERNATIVE TO DISMISS**

## I. INTRODUCTION

Defendant Nebula Genomics, Inc.'s ("Nebula") motion to transfer fails because Plaintiff did not agree to litigate every dispute she might conceivably have with Nebula in Suffolk County, Massachusetts. Nebula's argument to the contrary relies entirely on a contractual forum selection clause that plainly relates only to disputes between the parties arising from the contract itself. The forum selection clause at issue says nothing about litigating disputes such as this one, brought by an Illinois resident seeking to enforce an Illinois privacy statute on behalf of a class of Illinois residents. Moreover, even if the forum selection clause could be read to encompass non-contractual disputes such as this case, it is permissive, not mandatory, in that it does not provide that Massachusetts is the only venue in which the parties may litigate their disputes.

Nebula's alternative motion to dismiss fares no better. The Complaint lays out, in detail, how Nebula shares genetic information with Defendants Meta, Google, and Microsoft. And despite Nebula's baseless arguments to the contrary, the Complaint alleges repeatedly that Plaintiff's genetic information, like all Class Members, was transmitted by Nebula to each technology behemoth, along with Plaintiff's identifying information. For these reasons, and those set forth more fully below, Nebula's motion should be denied in its entirety.

## II. BACKGROUND

For purposes of this motion to dismiss, the following factual allegations of the Complaint are taken as true. *See Beattie v. Emerald Expositions*, 2024 WL 4346634 n.1 (N.D. Ill. Sep. 30, 2024 (Cummings, J.) (citing *Allen v. Brown Advisory, LLC*, 41 F.4th 843, 850 (7th Cir. 2022)).

Nebula is a commercial genetics company that offers genetic testing and analysis. Dkt. 1, ¶ 27. Nebula offers DNA tests, and also offers DNA analysis for customers who have taken a DNA test offered by another genetic testing company. Dkt. 1, ¶ 28. Nebula tells its customers and potential customers that its DNA analysis provides 50 times more information than the original raw data file from other DNA testing services, offering its customers personalized reports on hundreds of topics such as predisposition to disease, physical characteristics, and the impact of genetics on personality. Dkt. 1, ¶ 29. As Nebula itself acknowledges, genetic information can be used for malicious ends by bad actors, such as authoritarian governments seeking to "discriminate against or prosecute groups of people." Dkt. 1, ¶ 31.

To protect the highly confidential genetic information of Illinois residents, in 1998 the Illinois Legislature enacted the Genetic Information Privacy Act ("GIPA"), 410 ILCS 513/1 *et seq.* In doing so, the Legislature recognized that "[t]he public health will be served by facilitating voluntary and *confidential* nondiscriminatory use of genetic testing information." 410 ILCS 513/5 (emphasis added). In short, GIPA simply says that the results of a DNA or genetic test – or whether

an individual has taken a genetic test at all – is confidential, and that the person who had that test is the only one that is entitled to the results. No one else can even know that the individual has taken a genetic test without that person's knowledge or permission. Dkt. 1, ¶ 22.

To achieve this goal, GIPA proscribes any person from, among other things, disclosing genetic testing and information derived from genetic testing to any person other than the individual tested or to persons specifically authorized in writing in accordance with GIPA. *See* 410 ILCS 515/15(a). Furthermore, GIPA also makes it unlawful to disclose to a third party even the fact that an individual has undergone any genetic testing at all. 410 ILCS 513/30 (a).

Despite the clear requirements of GIPA, Nebula shares its customers' genetic information with third parties, specifically Defendants Meta, Google, and Microsoft. Dkt. 1, ¶ 32. Nebula does so because it has installed and enabled analytics and advertising tools on its website, specifically the Facebook Pixel, Microsoft Conversion Tracking, Microsoft Clarity, and Google Analytics and Tag Manager. *Id.* Each of these analytics tools uses "cookies" that are installed on the user's device, which track a website user's activities as she browses the website. Among the information provided to Meta, Google and Microsoft from Nebula's website via these cookies is Nebula users' genetic information. Specifically, as alleged in the Complaint:

<u>*Facebook Pixel*</u>

- Nebula programmed the Facebook pixel to collect and transmit to Meta information regarding consumers' purchases and registrations of genetic testing kits. Dkt. 1, ¶ 48.
- Nebula programmed its website to send this information to Meta along with the consumer's unique Facebook ID. Dkt. 1, ¶ 49.
- A consumer's unique Facebook ID can be used to identify the consumer, and accordingly constitutes personally identifiable information ("PII"). Dkt. 1, ¶35-36.
- Accordingly, for every Nebula user with Facebook accounts – *including Plaintiff* – Nebula has communicated to Meta that the user had undergone genetic testing, in violation of GIPA. Dkt. 1, ¶ 52.

*Microsoft Conversion Tracking*

- Nebula programmed Microsoft's Conversion Tracking to collect and transmit to Microsoft information regarding consumers' purchases and registrations of genetic testing kits. Dkt. 1, ¶ 58.

- Nebula programmed its website to send this information to Microsoft along with the consumer's unique Microsoft User ID ("MUID"). Dkt. 1, ¶ 59.

- A consumer's unique MUID can be used to identify the consumer, and accordingly constitutes PII. Dkt. 1, ¶¶ 55-56.

- Accordingly, for every Nebula user – *including Plaintiff* – who has visited Nebula.org's website and used its DNA analysis services, Nebula has communicated to Microsoft that the user has undergone genetic testing, in violation of GIPA. Dkt. 1, ¶ 62.

*Microsoft Clarity*

- Nebula programmed Microsoft Clarity to collect and transmit to Microsoft information regarding consumers' purchases and registrations of genetic testing kits as well as information regarding the specific results and analysis of their genetic tests. Dkt. 1, ¶ 72.

- Moreover every time a Nebula user generates a report on a disease, disorder, or physical or psychological attribute from Nebula's library, Nebula discloses that user's genetic information to Microsoft via the Microsoft Clarity tracker. Dkt. 1, ¶ 77.

- Nebula transmits this information to Microsoft with the consumer's unique MUID which, as set forth above, constitutes PII. Dkt. 1, ¶ 78.

- Accordingly, for every Nebula user – *including Plaintiff* – who has visited Nebula.org's website and used its DNA analysis services, Nebula has communicated to Microsoft via Microsoft Clarity that the user has undergone genetic testing, in violation of GIPA. Dkt. 1, ¶ 80.

- Similarly, for every Nebula user – *including Plaintiff* – who has viewed Nebula reports to assess their genetic predisposition to various diseases, disorders, or physical traits, Nebula has also shared such information with Microsoft via Microsoft Clarity in violation of GIPA. Dkt. 1, ¶ 81.

*Google Analytics and Tag Manager*

- Nebula also utilizes Google Tag Manager to share a user's genetic information with Google. Dkt. 1, ¶ 86.

- Tag Manager, like the Facebook pixel and Microsoft Conversion Tracking and Clarity, utilizes a unique Google ID to allow the company to "analyze the signed-in user experience, and understand user behavior across devices." Dkt. 1, ¶ 83.

- Accordingly, for every Nebula user – *including Plaintiff* – who has visited Nebula.org's website and used its DNA analysis services, Nebula has communicated to Google that the user has undergone genetic testing, in violation of GIPA. Dkt. 1, ¶ 90.

- Similarly, for every Nebula user – *including Plaintiff* – who has viewed Nebula reports to assess their genetic predisposition to various diseases, disorder, or physical traits, Nebula has also shared such information with Google in violation of GIPA. Dkt. 1, ¶ 91.

Plaintiff Portillo was a Nebula user from March of 2021 until her subscription expired in July of 2023. Dkt. 1, ¶¶ 97-99. During that time period, she requested a report on Nebula's analysis of her genetics test, and also regularly accessed the Nebula app to review various information provided by Nebula based on the results of her genetic test. Dkt. 1, ¶¶ 98 & 100. Via the processes described above, when Ms. Portillo obtained and reviewed Nebula's analysis of her genetic information, Nebula shared her genetic information with Meta, Microsoft and Google. Dkt. 1, ¶ 102. Such information included not only the fact that she had taken a genetic test, but also specific information regarding her genetic attributes. *Id.*

Ms. Portillo believed that the information she submitted to Nebula would be kept confidential, private, and secure. Dkt. 1, ¶ 103. Nebula never informed Ms. Portillo that her genetic information would be disclosed to anyone – let alone tech behemoths such as Meta, Microsoft and Google – when she obtained and viewed Nebula's analysis of her genetic data. Dkt. 1, ¶ 105. Mr. Portillo never consented, agreed, or gave permission – written or otherwise – to Nebula to disclose her genetic information to any third party. Dkt. 1, ¶ 105.

## III. DISCUSSION

### A. Transfer to Massachusetts is not Appropriate Because Plaintiff did not Agree to Litigate Nebula's Violation of her Privacy Rights Only in Massachusetts

Nebula's motion to transfer misses the mark for two reasons: First, Nebula wrongly seeks to apply a forum selection clause limited to the Parties' contract to Plaintiff's claim for violation of state privacy law. Stated another way, Nebula's argument assumes that the forum selection clause in its Terms of Use applies to this litigation, when it does not. Second, the forum selection clause is permissive, not mandatory, and does not provide that Massachusetts is the sole venue for litigation between the parties.

The "forum selection clause" is in fact not even identified as such in the TOU, but rather is part of the provision setting forth the law governing the Parties' contractual agreement (Dkt. 54-2, p. 8):

> Governing Law.
>
> This Agreement shall be construed according to the laws of the State of Massachusetts. Venue for any dispute shall lie in Suffolk County, Massachusetts.

This provision does not constitute Ms. Portillo's agreement to litigate violations of Illinois privacy laws in Massachusetts. To the contrary, the provision plainly applies only to disputes relating to the agreement itself. The heading itself – "Governing Law" – indicates that the provision is intended to apply to disputes arising from the agreement, because the Parties cannot have agreed that Massachusetts law would apply to a case for violation of an Illinois statute. The first sentence of the provision – calling for the application of Massachusetts law to construction of the agreement – further establishes that the provision is meant to apply solely to issues arising from the agreement

itself. Read in context, the last sentence's reference to "any dispute" can also only mean to apply to a dispute arising out of the agreement itself.[1] This case is not that.

Moreover, the forum selection clause at issue here is permissive, not exclusive. "The general rule that has emerged from 'cases containing forum selection clauses is that when only jurisdiction is specified [in a forum selection clause] the clause will generally not be enforced [as exclusive] without some further language indicating the parties' intent to make jurisdiction exclusive.'" *Boland v. George S. May Intern. Co.*, 969 N.E.2d 166, 172 (Mass. App. 2012) (quoting *John Boutari & Son, Wines & Spirits, S.A. v. Attiki Importers & Distribs. Inc.*, 22 F.3d 51, 52-53 (2nd Cir. 1994)).

The same rule applies under Illinois law; for example, the Court in *Continental Cas. Co. v. LaSalle Re Ltd.*, 500 F. Supp. 2d 991, 994 (N.D. Ill. 2007) denied a motion to dismiss for improper venue because the forum selection clause did "not state that 'all disputes *shall be* resolved' in an Illinois court, that 'venue is proper *only* in an Illinois court' or the like." *Id.* (emphasis in original); *see also Hull 753 Corp. v. Elbe Flugzeugwerke GmbH*, 58 F. Supp. 2d 925, 927 (N.D. Ill. 1999) ("When parties to a contract locate jurisdiction in a certain court, it does not necessarily follow that they have agreed to venue only in that court"); *cf. IFC Credit Corp. v. Rieker Shoe Corp.*, 881 N.E.2d 382, 391 (Ill. App. 2007) (holding forum selection clause that stated disputes "shall be venued *exclusively*" in the chosen forum was mandatory rather than permissive) (emphasis added).

Here, the forum selection clause provides only that "venue shall lie in Suffolk County, Massachusetts." It does not say venue shall lie "exclusively," or "solely," or "only" in Massachusetts. At best, the forum selection clause establishes that Plaintiff consented to the

[1] At best, the clause is ambiguous as to whether it applies to non-contractual disputes; as such, it must be construed against Nebula as the drafter. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998) (applying Illinois law); *Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44, 49 (1st Cir. 2004) (applying Massachusetts law).

jurisdiction in Massachusetts; it does not establish that Plaintiff consented to the exclusive jurisdiction of the Massachusetts courts.

Nebula's cited cases are inapposite, as they arise from mandatory forum selection clauses that unquestionably covered the dispute at issue. *Atlantic Marine Const. Co., Inc. v. U.S. Dist. Ct. for W.D. Tex.*, 571 U.S. 49 (2013) arose from a payment dispute under the contract containing the forum selection clause, which provided for exclusive jurisdiction in Virginia. *Id.* at 53. Similarly, the clause in *E.K.D. ex rel. Daves v. Facebook, Inc.*, 885 F. Supp. 2d 894 (S.D. Ill. 2012) covered "any claim, cause of action of dispute (claim) you have with us arising out of or relating to … Facebook *exclusively* in a state or federal court located in Santa Clara County, California." *Id.* at 898 (emphasis added). Finally, *IFC Credit Corp. v. Aliano Bros. General Contractors, Inc.*, 437 F.3d 606 (7th Cir. 2006) was also a contract dispute, and also involved a forum selection clause establishing "exclusive" venue in the chosen forum. *Id.* at 607.

The forum selection clause at issue here, in contrast to the cases cited by Nebula, does not apply to disputes arising from violations of Illinois state privacy laws, and is permissive rather than mandatory. Accordingly, Nebula's motion to transfer should be denied.

### B. Plaintiff's Allegations Establish the GIPA Claim

#### *1. Legal Standard*

When ruling on a motion to dismiss for failure to state a claim, a court must accept the complaint's well-pled factual allegations as true and draw all reasonable inferences in the plaintiff's favor. *Sprint Spectrum, L.P. v. City of Carmel, Indiana*, 361 F.3d 998, 1001 (7th Cir. 2004). The Federal Rules do not require "detailed factual allegations," and a complaint needs only to "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678(2009). The pleading must describe the claim in enough detail to give the defendant notice of the claim and the grounds

on which it rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007), ciging *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The allegations need only plausibly suggest the possibility of a right to relief above the "speculative level." *Id.*

### 2. *The Complaint Contains Detailed Factual Allegations Establishing Nebula's Disclosure of Plaintiff's Genetic Information*

Nebula's first argument is that the Complaint describes only a hypothetical scenario of Nebula's sharing of genetic information without tying Plaintiff's activities to the hypothetical. To the contrary, Nebula's practices as alleged in the Complaint are no hypothetical, but rather a highly detailed explanation – complete with screen shots – of Nebula's installation of various cookies and trackers that transmit genetic information to Meta, Microsoft and Google. *See, generally,* Dkt. 1, ¶¶ 30-91. Specifically, the Complaint details how Nebula's use of cookies and trackers transmits the genetic information of users who have purchased, registered, and uploaded test kits and reviewed analyses and reports relating to their genetic testing. *Id.* Throughout these detailed allegations, the Complaint makes clear that Nebula engaged in these privacy-violating practices with respect to Plaintiff and putative class members. *See, e.g.*, Dkt. 1 ¶¶ 52, 62, 73, 79, 80, 81, 83, 87, 90, 91.

These allegations alone are sufficient to state a claim against Nebula for its violation of GIPA. The Complaint goes even further, however, tying Plaintiff's use of Nebula directly to the processes by which Nebula illegally discloses the genetic information of all its users. The Complaint alleges that Plaintiff: "purchased and took a Nebula genetics test," Dkt. 1, ¶ 97; "requested a report on Nebula's analysis of her genetic test, which she then reviewed," Dkt. 1, 98; and "regularly accessed the Nebula app to review various information provided by Nebula based on the results of her genetic test." Dkt. 1, ¶ 100. Finally the Complaint expressly links Plaintiff's activities with the processes described earlier, alleging that "[v]ia the processes described above,

when Ms. Portillo obtained and reviewed Nebula's analysis of her genetic information, Nebula shared her genetic information with Meta, Microsoft and Google. Such information included not only the fact that she had taken a genetic test, but also specific information regarding her genetic attributes." Dkt. 1, ¶ 102.

These detailed factual allegations are wholly distinguishable from those in Nebula's cited cases. As Nebula concedes, in *Nienaber v. Overlake Hosp. Med. Ctr.*, 733 F. Supp. 3d 1072 (W.D. Wash. 2024), the complaint did not allege that the plaintiff had engaged in the activities triggering the allegedly violative information sharing through the Facebook pixel. *Id.* at 1083. Here, in sharp contrast, Plaintiff expressly alleges that she did engage in the activities triggering the sharing of information via the Facebook pixel (as well as the other cookies and trackers), by purchasing, taking, and uploading a DNA test, requesting and reviewing Nebula's analysis of her genetic test, and continuing over the next several years to review additional information provided by Nebula based on the results of her genetics test.

*B.K. v. Eisenhower Med. Ctr.*, 721 F. Supp. 3d 1056 (C.D. Cal. 2024) is similarly unhelpful to Nebula's argument. Again, as Nebula's own quoted passage shows, the plaintiffs in that case alleged only that they started using a website and thereafter began receiving unsolicited ads, but provided no more information about the alleged disclosures. The Complaint in this case, on the other hand, alleges that Plaintiff took a genetics test and uploaded it to Nebula's website. The Complaint further alleges that Nebula disclosed this information to Meta, Microsoft and Google through their cookies and trackers along with Plaintiff's PII. These allegations alone are sufficient to state a claim under GIPA. 410 ILCS 513/30(a) (prohibiting disclosure of "the identity of any person up on whom a genetic test is performed or the results of a genetic test in a manner that permits identification of the subject of the test").

A more analogous case is *Tracy v. Elekta*, 667 F. Supp. 3d 1276 (N.D. Ga. 2023), in which the plaintiff alleged that his genetic information was provided to the defendant and included in his medical records, which were subsequently breached by a third party. In denying the defendant's motion to dismiss, the Court held that "[t]he allegation that Bowsky's information was provided along with the additional factual contentions Plaintiffs make is sufficient to state a claim for relief under GIPA as to him." *Id.* at 1288. So, too, here – Plaintiff has alleged that she provided her genetic information to Nebula and reviewed analyses of that information on Nebula's website; these allegations, together with the detailed allegations of how Nebula discloses its users' genetic information and PII to Meta, Microsoft and Google via the cookies and trackers on its website, are sufficient to state a claim under GIPA.

Nebula also argues that the GIPA claim should be dismissed because the Complaint does not specifically allege that the various cookies and trackers were installed on the Nebula website during the two-plus years between March of 2021 and July of 2023 that Plaintiff was a Nebula user. This argument elevates form over substance. While it is certainly true that Plaintiff does not (and could not) know when Nebula installed the trackers and thereby began illegally disclosing its users' genetic information, The Complaint plainly alleges that Plaintiff's information was in fact shared via the cookies and trackers. The reasonable inference of these allegations is that Plaintiff is informed and believes that they were in use during the time she was a Nebula user; only Nebula knows these facts, and Plaintiff should be able to prove them through discovery.

3. *The Complaint Adequately Alleges that Nebula Disclosed Plaintiff's Genetic Information*

Nebula's next argument seeks to wholly rewrite GIPA to exclude various categories of genetic information that are expressly set forth in the statute. For example, Nebula argues that GIPA does not cover the information transmitted by the Facebook pixel or Google Tag Manager

that Plaintiff registered a DNA test kit and purchased a testing kit. Nebula acknowledges that the definition of "genetic information" includes a "request for, or receipt of, genetic services," and that "genetic services" is defined to include "(1) A genetic test; (2) Genetic counseling (including obtaining, interpreting, or assessing genetic information); or (3) Genetic education." 45 C.F.R. § 160.103.[2] Nonetheless, Nebula argues in *ipse dixit* fashion that "merely procuring a swab test kit for potential use is not 'requesting a genetic test' within the meaning of GIPA, and therefore is not 'genetic information.'" (Dkt. 54 at 12.) Nebula provides no support for this assertion, most likely because it makes no sense. If purchasing a genetic test doesn't constitute a "request for, or receipt of," a genetic test, then the statute is without meaning.

Moreover, Nebula glosses over the allegations relating to the other cookies and trackers it has installed on its website. As alleged in the Complaint, the Microsoft Conversion Tracker, like the Facebook pixel, disclosed to Microsoft that Plaintiff had requested genetic services by purchasing and registering her genetic test. Dkt. 1, ¶¶ 58-61. Microsoft Clarity is even more pernicious, as it provides a "session replay" which allows Nebula (and, by extension, Microsoft), to see exactly what information Plaintiff and putative class members were viewing as they reviewed the results of their genetic test. Dkt. 1, ¶¶ 65-68. Accordingly, Nebula's argument that the Complaint does not plausibly allege that Nebula disclosed Plaintiff's genetic information in violation of GIPA is without merit, and provides no basis for dismissal of Plaintiff's claim.

#### 4. *The Complaint Adequately Alleges that Nebula Identified Plaintiff as Having Taken a Genetic Test*

Finally, Nebula argues that Plaintiff has failed to allege Nebula's unauthorized identification of Plaintiff as a person who had taken a genetic test. Curiously, however, Nebula's

[2] By its terms, GIPA incorporates the HIPAA definitions set forth in 45 C.F.R. § 160.103. 410 ILCS 513/10.

argument focuses solely on Google's Tag Manager, stating only in a footnote that it "reserves all arguments concerning the nature of the Microsoft MUID and the Facebook ID." Dkt. 54, fn. 3.[3] Stated another way, Nebula appears to concede (as it must) that Plaintiff has adequately alleged that via the MUID and Facebook ID, Nebula did, in fact, disclose her identity to Facebook and Microsoft as a person who had taken a genetic test. Courts across the country have held that transmission of a user's Facebook ID along with other privacy-protected information constitutes the transmission of PII. *See, e.g., Golden v. NBCUniversal Media, LLC*, 688 S. Supp. 3d 150, 151 (collecting cases and stating, "Courts have uniformly held Facebook IDs to constitute PII under the" Video Privacy Protection Act).[4] This concession is by itself fatal to Nebula's motion to dismiss the Section 30(a) portion of Plaintiff's claim. Even without Nebula's concession, however, the Complaint – again, in very detailed fashion – describes how the Facebook ID and MUID that were transmitted with Plaintiff's genetic information can be used to identify her, and thus constitute PII. Simply put, the Complaint alleges facts showing that Nebula disclosed to Meta, Microsoft and Google that Plaintiff had taken a genetic test, and provided Plaintiff's identifying information with that disclosure. Nebula's protestations to the contrary notwithstanding, these allegations are more than sufficient to state a claim for a violation of Section 30(a) of GIPA.

## IV. CONCLUSION

For each of the foregoing reasons, Plaintiff respectfully requests that the Court deny Nebula's motion to transfer venue and motion to dismiss in their entirety, and award Plaintiff such other and further relief the Court deems just and proper. While the foregoing demonstrates that

---

[3] Even as to Google Tag Manager, Nebula ignores that Plaintiff has specifically alleged that Nebula transmitted PII to Google with her genetic information. Dkt. 1, ¶ 83. Thus, Nebula's argument is little more than an unsupported denial of Plaintiff's allegation, and therefore an insufficient basis upon which to dismiss Plaintiff's claim.

[4] The Microsoft ID is functionally equivalent to the Facebook ID, and thus also constitutes PII under the reasoning of these cases.

Plaintiff has adequately pled her claim for GIPA violations against Nebula, Plaintiff further requests, in the event the Court deems Plaintiff's factual allegations insufficient, leave to amend the Complaint to remedy any defects noted by the Court.

Respectfully submitted,

Dated: February 13, 2025

*/s/Thomas M. Hanson*

Jon Loevy jon@loevy.com
Mike Kanovitz mike@loevy.com
Tom Hanson hanson@loevy.com
Loevy & Loevy
311 N. Aberdeen St., 3 rd Floor
Chicago IL 60607
312.243.5900

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Thomas M. Hanson, hereby certify that the above document was filed on February 13, 2025 with this Court through the CM/ECF system which hereby effected service on all counsel of record.